UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


MAGNACROSS, LLC,                    )
                                   )
                Plaintiff,         )
                                   )
    VS.                            ) No. 3:20-CV-1959-M
                                   )
OKI DATA AMERICAS, INC.,           )
                                   )
                Defendant.         )
_____)


MOTION TO DISMISS -- VIA VIDEOCONFERENCING
BEFORE THE HONORABLE BARBARA M.G. LYNN
UNITED STATES DISTRICT COURT JUDGE
JULY 14, 2021
DALLAS, TEXAS

FOR THE PLAINTIFF:

    ISAAC P. RABICOFF
    RABICOFF LAW, LLC
    3839 McKinney Avenue, Suite 155-2328
    Dallas, TX  75204
    (773) 669-4590

    PAPOOL S. CHAUDHARI
    PRA LAW
    2800 Bartons Bluff Lane, Suite 1902
    Austin, TX  78746
    (214) 702-1150

FOR THE DEFENDANT:

    MARC R. LABGOLD
    MEGAN C. LABGOLD
    PATRICK J. HOEFFNER
    MARC R. LABGOLD, PC
    12005 Sunrise Valley Drive
    Reston, VA  20191
    (703) 901-8860

    WILLIAM D. TAYLOR
    TAYLOR & TAYLOR LAW, PC
    4115 Highgrove Drive

        Arlington, TX  76001
        (817) 483-8388

        Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.
_____

                DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                   Federal Official Court Reporter
                  1100 Commerce Street, 15th Floor
                        Dallas, TX  75242
                        (214) 753-2325

1              (PROCEEDINGS BEGAN AT 2:00 PM.)

2              THE COURT:  This is Judge Lynn.  I don't know if

3       everybody is on the line yet.

4              MR. LABGOLD:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.

6              All right.  I have Mr. Rabicoff and Mr. Chaudhari for

7       the Plaintiff; Mr. Labgold and Ms. Labgold for the Defendants.

8              Any others that I don't see, make your appearances,

9       please.

10             MR. TAYLOR:  William Taylor, local counsel for OKI

11      Data.

12             THE COURT:  Okay.  Thank you.

13             MR. HOEFFNER:  Patrick Hoeffner for OKI Data.

14             THE COURT:  Okay.  I think everybody else on the line

15      is with my office.

16             All right.  I want to begin by talking with

17      Mr. Chaudhari and Mr. Rabicoff.

18             So not that I ever would have had somebody accuse me of

19      a cut-and-paste job on a brief, but if I had done that and I got

20      called out for it, I sure would not leave my brief there for two

21      months unamended.

22             Mr. Chaudhari, would you like to speak to that?

23             MR. CHAUDHARI:  I'm -- I'm only local counsel on this

24      matter.  I defer to Mr. Rabicoff.

25             THE COURT:  Well, you signed it.  You signed the

1  papers, --

2          MR. CHAUDHARI:  That's correct.

3          THE COURT:  -- did you not?

4          MR. CHAUDHARI:  I did, Your Honor.

5          THE COURT:  The response?

6          MR. CHAUDHARI:  Yes, Your Honor.

7          THE COURT:  Okay.  Well, you're responsible for its

8   content, Mr. Chaudhari.  Okay?

9          Well, if you read your own asserting positions on Claim

10  12, that wasn't even asserted by you as the Plaintiff.

11          Are you admitted in our court, Mr. Chaudhari?

12          MR. CHAUDHARI:  I am, Your Honor.

13          THE COURT:  Okay.  That's not sufficient under *Dondi*.

14          Mr. Rabicoff?

15          MR. RABICOFF:  Yes, Your Honor.

16          THE COURT:  Okay.  Speak to the question.  In May

17  counsel filed a Reply Brief on the Motion to Dismiss that pointed

18  out that your brief is a cut-and-paste job that has little to do

19  with the issues teed up in this case.  And if you went back and

20  looked at your brief in response, you would see that that is,

21  indeed, true because, among other things, your brief includes

22  Claim 12 that you did not assert against the Defendant.

23          So why did you leave that -- First of all, my first

24  question would be:  Why did you file a brief like that?  My

25  second question is:  Once it was pointed out to you in May that

5

1    your cut-and-paste job was not either responsive to the basis for

2    the 101 motion or appropriate, given that it was taking positions

3    with respect to issues that you yourself, on behalf of the

4    Plaintiff, had not claimed, why did you not seek to at least

5    amend your inappropriate response?

6            MR. RABICOFF:  Your Honor, respectfully, I think we

7    would say that this, first of all, was not a cut-and-paste job

8    but, in fact, we directly addressed the substance of the opening

9    brief.  For example, it's true that we -- we illustrated -- we

10   discussed both Claims 1 and 12, but that was simply for the

11   purpose of just explaining certain facets of the claim that had

12   been mentioned in general.  So for example, there was a

13   discussion of Claim 12 in the background, right, giving the

14   background of the patent.  However, there wasn't any mention of,

15   you know, Claim 12 specifically being asserted.  In fact, it

16   was -- we really only spoke to the invented limitations of Claim

17   1.  I mean to be honest, we're talking about relatively close

18   claims, one being a method and the other an apparatus.

19           So our view is, you know, we directly, you know, first

20   of all, made a positive case for patent eligibility, but then,

21   second of all, most importantly, we did very clearly cover the --

22   how there's a concrete assignment of functions to each of the --

23   the claimed pieces of structure.  So the control means, for

24   example, and the transmitter and the multiplexer, and all of that

25   is completely appropriate to Claim 1.

1    So our view is that, in fact, we directly ---

2    THE COURT:  Is the multiplexer in Claim 1,

3 Mr. Rabicoff?

4    MR. RABICOFF:  I'm sorry.  The control means and the

5 transmitter ---

6    THE COURT:  Is the multiplexer in Claim 1,

7 Mr. Rabicoff?  Is it?

8    MR. RABICOFF:  Let me just make sure we -- we have the

9 Claim 1 in front of us.

10    THE COURT:  Well, that would be a good idea,

11 Mr. Rabicoff, since that's the only claim on which you have sued

12 the Defendants is Claim 1.

13    And while I've got the floor, you also made an issue

14 about what the Defendants were allegedly saying about

15 infringement when their brief is not directed to issues related

16 to infringement.  It's directed only to Claim 1.

17    Now you're an officer of the Court.  Are you

18 representing to me, as you sit there today, Mr. Rabicoff, that

19 this was an originally written brief, written for this case, and

20 not pirated from some other case?  And I am holding you to it.

21 So answer the question.

22    MR. RABICOFF:  Yes.  Your Honor, just to be clear, I

23 mean that was, of course, a mistake on our part.  We did -- did

24 consult, as appropriate, right, with former -- with associates of

25 former counsel to shed light because, of course, this other case,

1   the *A.B.P.* case was directly relevant; right?  So, of course,

2   we're not going to deny that we -- we consulted with former

3   counsel, but we used aspects of that briefing.  And I will

4   completely acknowledge that, you know, that was -- that was a

5   typographical error.  But, most importantly, I mean there were

6   numerous citations to the opening brief; right?  And all of those

7   were -- those citations were perfectly mapped; right?  They

8   specifically addressed arguments made in opening brief,

9   characterizations of claim language, all of that.  And, of

10  course, that was all with respect to Claim -- the asserted Claim

11  1.  So that was all completely on par.

12          It looks like there was some error.  I believe it was

13  in the drafting; that that other section did enter into it.  So I

14  apologize for that oversight, Your Honor.

15          THE COURT:  Okay.  We are so far beyond an apology.  I

16  don't have words to express it, Mr. Rabicoff.  I wasn't born

17  yesterday.  You don't even address the key cases that are the

18  subject of the 101 motion in your papers.

19          And, Mr. Chaudhari, you better not think that it is

20  acceptable in my court or in the Northern District of Texas to

21  put your name on a brief that you're not going to take

22  responsibility for, particularly when you signed it.  So if you

23  think admission to our court carries so little weight, I am here

24  to convince you otherwise.

25          If -- If I am not conveying sufficiently to you,

1    Mr. Rabicoff, and to you, Mr. Chaudhari, how very unhappy I am

2    about what you filed in this case because, to me, it is

3    absolutely a cut-and-paste job, and I think it is apparent.  And

4    that you let that sit there without making corrections -- It's

5    not a typographical error, Mr. Rabicoff.  You included an entire

6    section of a brief that has nothing whatever to do with the

7    motion in this case.  That's not a typographical error.  That is

8    far beyond a typographical error and completely inconsistent with

9    your obligations as counsel to take appropriate professional

10   actions in this case on behalf of your client.  So I'm going to

11   begin there.

12           Before we get to the 101, I want to discuss the issues,

13   even though I haven't set it for hearing, that are raised in the

14   Amended Complaint that was filed yesterday.

15           Mr. Labgold, Mr. Rabicoff is representing that you have

16   a settlement agreement between you and the Plaintiff.  Would you

17   like to be heard on that?

18           MR. LABGOLD:  Thank you, Your Honor.  For the record,

19   this is Marc Labgold.

20           We do not have a settlement agreement.  As the

21   pleadings make clear, we went through a series of discussions

22   prior to that point at which point we had reached an agreement in

23   principle.  The only term that was agreed to was the amount,

24   which for purposes here I will not disclose, but the amount was

25   the only issue.

1          After that, we went into a series of -- what was

2     supposed to be a series of discussions to reach -- actually come

3     to terms for a settlement agreement, and that has not occurred.

4          THE COURT:  Well, what he's representing in his papers

5     is that your modifications changed the amount.  Is that true?

6          MR. LABGOLD:  Ultimately, yes.

7          THE COURT:  Okay.  Well, what right would you have to

8     change the amount if you all agreed on an amount subject to

9     satisfactory resolution on the terms?

10          MR. LABGOLD:  Well, we didn't actually reach -- We had

11     on the one term.  We had reached a conceptual agreement in

12     principle on the one term with regard to the amount.

13          As we got into the discussion -- And I just want to be

14     careful here as to what I should be revealing or not from a

15     settlement discussion, but as we got into other material terms,

16     there was disagreement.  There were statements that were on one

17     side.  Our party needed certain things.  There were statements on

18     the other side that that was not possible.  There were

19     misrepresentations made.  And at that point in time we undertook

20     to answer or, rather, filed the Motion to Dismiss in lieu.

21          And so subsequent to that time, because my client had

22     engaged in additional activity and incurred additional expense,

23     when it was brought back up that they could come in conceptual

24     agreement back to the one issue, we said that if it was, it would

25     be for the lowered amount, and that's how that occurred.

1          THE COURT:  Okay.  Well, that issue, do you agree that

2     issue cannot be conceivably resolved today?  All I have is an

3     Amended Complaint.  So no matter what I do on the 101 issue, the

4     alleged settlement agreement remains.

5          MR. LABGOLD:  Well, conceptually, yes.  I just put this

6     out there that since it is supplemental jurisdiction on a --

7     technically, I believe.  We respectfully submit that if the

8     patent was found to be invalid, there would be no basis for that

9     claim being before this Court.

10         THE COURT:  Well, you're not suggesting I can't keep

11    it.  You're suggesting I shouldn't keep it, because I would have

12    had jurisdiction because it's related to the federal question.

13         MR. LABGOLD:  Absolutely.  Absolutely.  And if the

14    Court should decide, we would not oppose you actually keeping

15    that claim.

16         THE COURT:  All right.  Just a moment before we

17    proceed.  I want to check something in the briefing.

18         (Pause)

19         THE COURT:  Mr. Rabicoff, to finish the point I was

20    asking you about, I'm going to quote from your brief at the

21    bottom of 13.  It says, "The claims are directed -- are,

22    therefore, patent eligible under Section 101.  Arabic 1.  Claims

23    1 and 12 Are Directed to Patent-Eligible Subject Matter."

24         Then there is Page 14 that has one line on it because

25    the cut-and-paste job was not reviewed.

1          Page 15, it says, "Claims 1 and 12 do not recite an

2   abstract idea."

3          Throughout the brief, it is referring to the "claims"

4   when there's only one claim that is asserted.

5          At the bottom of Page 18, it says, "Claims 1 and 12

6   require a particular concrete and tangible form that is

7   unconventional."

8          So the Court does not believe it is a fair

9   characterization of your brief to say that Claim 12 was, quote,

10  "in the background."  Claim 12 is in the foreground, even though

11  it was not asserted.

12         Mr. Chaudhari, did you read the reply brief?

13         MR. CHAUDHARI:  I did not, Your Honor.

14         THE COURT:  Is it -- Am I correct, because I have just

15  an "S/signature," did you sign the original of the response,

16  Mr. Chaudhari?

17         MR. CHAUDHARI:  I did, Your Honor.

18         THE COURT:  Where did you get the information in the

19  brief?

20         MR. CHAUDHARI:  It was drafted by Mr. Rabicoff,

21  Your Honor.

22         THE COURT:  Okay.  Did you learn somewhere that that's

23  acceptable for you to sign a brief and not verify that the

24  contents of it are accurate?  That you're just a mail drop?

25         MR. CHAUDHARI:  No, Your Honor.

1          THE COURT:  Okay.  Well, if you did pick that up

2     somewhere, I'm here to disabuse you of that conclusion.

3          All right.  Mr. Rabicoff, this is not the first time

4     that you and I have had a conversation of this type.  You have

5     appeared before me before.  And if you think this is the way I

6     expect lawyers to practice in my court, you are sadly mistaken.

7          Mr. Labgold, I'll hear you on the 101 directed to Claim

8     1.  I'm not interested in hearing anything about claims that have

9     not been asserted or positions that you haven't taken.

10          MR. LABGOLD:  Okay.  Thank you, Your Honor.

11          If I could just clarify on one point.  The -- There

12     are -- As part of the amendment that was filed yesterday, they

13     have changed the claims apparently that they're asserting.  It's

14     not in the redline, but we went through carefully line by line,

15     and there are other changes.  So I just ---

16          THE COURT:  Okay.  Who -- Who did the redlining?

17          MR. CHAUDHARI:  I did, Your Honor.

18          THE COURT:  Did you just redline what you felt like

19     redlining and not the stuff you didn't feel like redlining?

20          MR. CHAUDHARI:  No, Your Honor.  I redlined it against

21     the Word version that I had in our system.

22          THE COURT:  Okay.  What claims are being asserted now,

23     Mr. Labgold?  Because I relied on the redlining.

24          MR. LABGOLD:  The language that's now being used is "at

25     least one claim."  And every reference to claim numbers has been

1  removed with the exception of the Exhibit 2 which remains the

2  claim chart which contains what they now would consider to be

3  "exemplary Claim 1."

4          THE COURT:  Do you think I'm entitled to rely on a

5  redline that was submitted to me as being indicative of all the

6  changes that have been made in the prior Complaint,

7  Mr. Chaudhari?

8          MR. CHAUDHARI:  Yes, normally.

9          THE COURT:  What do you mean "normally"?  Under what

10 circumstances would I not be entitled to rely on it?

11         MR. CHAUDHARI:  Nothing, Your Honor.

12         THE COURT:  Mr. Rabicoff, what about you?

13         MR. RABICOFF:  That's correct, Your Honor.  You should

14 be able to rely on it.

15         THE COURT:  So somebody give me an explanation for ---

16         (NOTE: Videoconferencing capabilities froze up.)

17         THE COURT:  Okay.  Preston call IT and tell them to

18 come up here.  This is the second time I've had poor Internet

19 connection in my office.

20         LAW CLERK PRESTON:  Okay.

21         THE COURT:  And, Preston -- Yes, go ahead.

22         LAW CLERK PRESTON:  Okay.

23         THE COURT:  Preston, bring me the Amended Complaint,

24 please.  I don't have it in front of me.

25         Mr. Chaudhari, can you hear me?

14

```
 1              MR. CHAUDHARI:  I can, Your Honor.

 2              THE COURT:  Mr. Rabicoff, can you hear me?

 3              MR. RABICOFF:  Yes, Your Honor.

 4              THE COURT:  Someone give me an explanation as to why I

 5   have a redline that doesn't reflect all the changes.

 6              MR. CHAUDHARI:  Your Honor, I apologize.  I redlined it

 7   against the Word version I had in my system.

 8              THE COURT:  Okay.  You'll all hold on a minute.  I have

 9   IT here and I'm trying to figure out -- Okay.  Hold on a minute.

10              (Pause)

11              THE COURT:  I'll go off the screen for just a moment.

12              (Pause)

13              THE COURT:  All right.  Can you hear me now?

14              Okay.  Can you hear me, Mr. Chaudhari?

15              MR. CHAUDHARI:  Yes, I can, Your Honor.  Thank you.

16              THE COURT:  Mr. Rabicoff, can you hear me?

17              MR. RABICOFF:  Yes, Your Honor.

18              THE COURT:  All right.  I'm on a different device in my

19   Law Clerk's office.

20              So when we were cut off, Mr. Chaudhari, you were

21   explaining to me the redline.

22              MR. CHAUDHARI:  Yes, Your Honor.  I ran a redline

23   against the Word version of the Complaint that we had in our

24   system, and I failed to check whether that Word version was the

25   exact same as the file-stamped original Complaint which I
```

1  believed it was but now I'm being told that it's not.

2        THE COURT:  Okay.  Well, we'll just add that to the

3  list of sources of my extreme unhappiness with the lack of

4  professionalism that is characterized by the handling of this

5  matter by Plaintiff's counsel.

6        I'm going to proceed, Mr. Labgold, with the assumption

7  that what we are talking about here is Claim 1 and only Claim 1.

8        MR. LABGOLD:  Okay.  Thank you, Your Honor.

9        The -- I'd like to start with kind of an unusual

10  situation because we now have the -- I don't have to address the

11  point that it's only Claim 1 since you've already done that.

12        So if we -- we take a look at the claim that we have

13  here, it's -- it's our position that the claim is drawn to an

14  abstract idea.  When we -- I think it's worthwhile just -- I

15  don't know.  Can we share screens so I can actually pull up a

16  document to show you?

17        THE COURT:  Are you asking me that question?

18        MR. LABGOLD:  Yes.

19        THE COURT:  I have no idea, Mr. Labgold.  That's above

20  my pay grade.

21        MR. LABGOLD:  With leave, I'd ask the Court for leave.

22  May I have my associate, Ms. Labgold, pull up the claim just so

23  we can see that we're all looking at the same thing?

24        THE COURT:  Sure.  Any relation, Mr. Labgold?

25        MR. LABGOLD:  Yes.  She's the younger and smarter

1    member of the family, my daughter.

2              THE COURT:  I thought it's just a coincidence.

3              MR. LABGOLD:  Yeah, it's a very common name in these

4    parts, but it's just ---

5              THE COURT:  Okay.  I've got it.  I have the patent.  So

6    if you're just trying to show me the patent, you don't need to

7    pull it up there, but if you're referring to something in

8    particular, that's helpful.  I've got it, but go ahead.

9              MR. LABGOLD:  Okay.  So looking at Claim 1, we see that

10   it's a method of wireless transmission of data, and the data can

11   be in analogue or digital format, so it's not specific.  And then

12   it transmits that data to a communication channel from at least

13   two data sensors to a data processing means.  And the method

14   compromises the step of division of said channel into subchannels

15   and transmitting the data from the sensors respectively through

16   the subchannels.

17             It's our position that this claim here on its face

18   recites two steps:  The step of division of the channel into

19   subchannels and the transmitting of data through the data sensors

20   through the subchannels.

21             Now the claim does go on, obviously, in that it says

22   "characterized."  So this is an uncommon way of defining it in

23   this term but sometimes we'll see like a "wherein" clause, and

24   this is kind of in that respect.  And it goes through these --

25   these three details which we can come back to later, but the

1   point being is that what we're dealing with here, we submit, is

2   when you strip Claim 1 of its excess verbiage, it's drawn to

3   nothing more than dividing a data channel into subchannels and

4   transmitting data from data sensors through the subchannels.

5         Now in their paper, one of the false assertions that

6   comes up from the cutting and pasting is that they state, for

7   example on Page 5, that "OKI argues that the claims are directed

8   to the abstract idea of transmitting information from multiple

9   sensors."  There is no such assertion.  Our position is that we

10  have dividing of a data channel and transmitting data from data

11  sensors through those channels.

12        Now they make an assertion at Page 5 again that the

13  claims, in this case Claim 1, "are patentably eligible because

14  they are directed to a specific way to solve a problem in

15  computer technology that improves computer functionality."  It's

16  our position that Claim 1 neither solves a problem in computer

17  technology, nor does it improve any computer functionality.  It

18  simply implements a known process, an admittedly known process

19  using the computer.

20        Now when we look at the Specification, and we're going

21  to look at Column 1, and I'll allow everyone to get to Column 1.

22        THE COURT:  Before we get there, Mr. Labgold, --

23        MR. LABGOLD:  Yes.

24        THE COURT:  -- since you directed me to Page 5 --

25        MR. LABGOLD:  Yes.

1       THE COURT:  -- of the Response, it says, "Claim 1" --

2  I'm quoting at the bottom of the page, the sentence beginning at

3  the next to the last line on Page 5, Claim 1, quote, "requires a

4  multiplexer that asymmetrically divides a communication channel

5  into subchannels such that the carrying capacities of the

6  subchannels are unequal," and then I'll omit the balance after

7  the semicolon.  Is that true?

8       MR. LABGOLD:  That is not true.  The Claim 1 does not

9  have any multiplexer.  And what is a curious point about this

10 patent, as it would relate to other claims which are not at issue

11 at the moment, but there is no multiplexer actually disclosed in

12 the Specification.  Rather, once this ---

13      THE COURT:  Okay.  Just a moment.

14      Mr. Rabicoff, is that statement that I just read into

15 the record from your brief true?

16      MR. RABICOFF:  Your Honor, we -- we disagree with this

17 point; right?  We use the term "multiplexer," but multiplexer,

18 right, should be underpinned with respect to Claim 1; right?

19 We're talking about a type of method of wireless transmission;

20 right?

21      THE COURT:  Okay.  Mr. Rabicoff, I'm asking you a very

22 simple question.  Does Claim 1 require a multiplexer?

23      MR. RABICOFF:  It requires that functionality.  It does

24 not have the word "multiplexer," but it's very important to note,

25 looking at the Specification, is the idea of the multiplexer is

1    the idea of dividing this wireless transmission into multiple

2    subchannels to allow -- to allow sensory input where there might

3    be different -- different levels of bandwidth requirements;

4    right?  So that's why it's very important that that term

5    "multiplexer" does, in fact, describe the function; right?  So

6    it's true that word is not -- And this underlines the need for

7    claim construction, but it's very important to note that that

8    functionality is precisely what a multiplexer is.

9           THE COURT:  Okay.  Did you ever say anywhere in your

10   brief that I should not rule on this now because I need to have a

11   claim construction?  And if so, where did you say that?

12          MR. RABICOFF:  Your Honor, that -- that continues to be

13   our position.  In fact, what our point was, that when we brought

14   up the *A.B.P.* case, the earlier ruling, we pointed out that --

15   that we're suggesting that the Court should reach that same

16   conclusion and analysis which was that claim construction is, in

17   fact, required.  If we actually look back at the briefing in

18   *A.B.P.*, ---

19          THE COURT:  Okay.  I'm not -- I'm not -- I didn't --

20   Here's a shocker for you:  I didn't go back and look at the

21   briefing --

22          MR. RABICOFF:  Sure.

23          THE COURT:  -- in another case where Mr. Labgold's

24   client was not a party.  I didn't and I won't.

25          So you tell me where in your brief you asked me to

 1    defer my ruling on 101 to enter into a claim construction.  Where

 2    did you do that?

 3           MR. RABICOFF:  Your Honor, there wasn't a specific

 4    request for claim construction, but it was requested that this

 5    same outcome be reached as in the *A.B.P.* matter.  And admittedly,

 6    there's -- We're not suggesting there's a *res judicata* issue,

 7    none of those things, but that was -- that was the sort of

 8    vehicle that we used to make that type of request.

 9           THE COURT:  Okay.  Well, on Page 5 of your brief in the

10    Introduction, you said, "This Court has already denied a Rule 12

11    *Alice* motion against the same claims of the same patent."  It's

12    not true that this case asserts the same claims, although Claim 1

13    is overlapping in both.  Is that correct?  In other words, --

14           MR. RABICOFF:  It's true that that one wasn't ---

15           THE COURT:  -- there's claims asserted.

16           All right.  Go ahead, Mr. Labgold.

17           MR. LABGOLD:  One would think after all this time, we

18    would remember to unmute without everybody else reminding me.

19           THE COURT:  It's impossible to get through a hearing

20    without at least one, "You need to unmute yourself."  Okay.

21           MR. LABGOLD:  Your Honor, if you could, please, refer

22    to Column 1, and I was talking about the conventional systems.

23           And in Column 1, Lines 37 to 40, we have the

24    discussion, "Conventionally, the data is transmitted from the

25    data sensors to the data processing function via conventional

1    conductors or cables which impose obvious inconveniences and

2    limitations on the convenient operation of the equipment."  So,

3    therefore, the Spec. admits that there were conventional systems,

4    as it was described, that these were actually done with the

5    wires.  And the only problem with that was it was apparently

6    inconvenient.

7           Now if you continue on, on Column 1, starting on Line

8    41, there's going to be a discussion of people trying to do this

9    in the prior art with a wireless system.  So the use of a

10   wireless system cannot be something that's going to be new but,

11   instead, that's been done conventionally as well.

12          So first, we have the conventional system of just

13   wires.  And in the wireless function, we can think of that as

14   applying the conventional system to the use of a computer to make

15   it more efficient.

16          Now through Column 1 up to the top of Column 2, it's

17   going to be discussed that there was still some shortcomings.

18   And with regard -- Column 1, at about Line 54, "The main

19   shortcoming of such prior proposals," and that's with regard to

20   wireless, "has been the sheer volume of data and the composite

21   nature of the data, such as the data -- mixture of data types;

22   example:  Digital and analog.  A further factor among the

23   shortcomings of these prior proposals is also the composite

24   nature of the data bandwidths to be transmitted."

25          And then it again says previously this had to be done

1    with 12 cables.

2           Now it goes on a little bit further to Page —— or

3    Line —— about Line 65, 66, and it says at Least for the data

4    sensors in the application that they're working on, an automotive

5    application, they produce high data rates necessitating

6    corresponding bandwidths to accommodate them.

7           Now I note here that it's important that they say,

8    "This doesn't apply to all sensors."  So this is apparently a

9    problem that exists with some sensors but not all.

10          There's going to be a further clarification of what

11   apparently is supposed to be the improvement in this patent at

12   Column 3, and that's going to start on Line 19.  And I read,

13   "Whereas prior proposals in relation to data transmission for

14   automotive and related systems (in which data sensors produce

15   substantially differing data rates) have ignored or overlooked

16   these differing data rate requirements, with the result that the

17   use of equal bandwidth subchannels has led to a non-utilization

18   of subchannel bandwidths for significant numbers of sensors

19   whereby the overall utilization of data transmission, capacity

20   allocated to the communications system has been very far from

21   perfect."

22          Now if we continue just briefly down a little bit

23   lower, it talks about how, by multiplexing, and picking up at

24   Line 33, "allows to be close —— far more closely matched to the

25   available capacity of its subchannel, and the twin evils of

1     subchannel underutilization and undercapacity for a given data

2     flow are thereby avoided."

3            So apparently, what we're supposed to take away from

4     this is that you could do it conventionally.  When people try to

5     do it wirelessly, these two evils came up, these twin evils, and

6     that was by not dividing the channels asymmetrically or

7     unequally.  Sometimes you had a big data flow, and that couldn't

8     fit through one channel, so it had to be divided into multiple

9     channels.  And sometimes the way the channels were divided, the

10    data flow was lower, and so you had underutilization.  So there

11    was like unused capacity.

12           Now as a practical sense, this is very similar to

13    anything that happens in the flow of water, for example, whether

14    it's unintentional by a course of nature or it's in-house in

15    plumbing.  We all know that there are water mains that run

16    through our cities, and hopefully they stay intact.  We usually

17    only think about them when they break, and those water mains are

18    very large in diameter.  By the time it gets to your

19    neighborhood, it steps down to a smaller.  And when it gets to

20    your house, it steps down to even smaller because the idea being

21    is you don't need to have a giant tube to actually carry the

22    amount of water that goes to our house.

23           But what's curious about this, that this is apparently

24    the whole radical idea that was supposed to be encompassed, is

25    that we find out later that it really doesn't even matter because

1    when you get to Column 6, if you look at Column 6 at Line 51 --

2    and I'll give everybody a moment to get there -- it starts off,

3    "Secondly, it is to be understood that while the invention has

4    been disclosed and defined by reference to specific subchannels

5    in the allocation of data from sensors to respective ones of

6    these, it is understood that the sensor producing a high data

7    rate may for that purpose have allocated to it a number of

8    subchannels or, thus, a group of subchannels accordingly."

9         So what this is saying is sometimes the data is still

10   too big and, when it is, you do it the same way you always did

11   it.  You just allocate it across a couple of other channels, and

12   suddenly the twin evils are no longer a problem.  We're back to

13   doing it exactly the way it was done before; the abstract idea of

14   dividing data and transmitting it through channels.

15        Now one of the things that this -- I know the Court is

16   well aware of is that we need to look at whether or not there's

17   language in the claims that ties this to whatever the alleged

18   improvement's going to be, and we're going to look at that in

19   regard to Step Two.  But it's important, while we're here at this

20   point, this idea that it's dividing up from one channel, that

21   it's big for the big data or a little channel for the little data

22   or sometimes you still have to just do it not by ones but still

23   divide it, if we look back at Claim 1 and we look at the

24   Subparagraph (c), one of the "characterized by" characteristics

25   is the divided data is allocating the data from said local data

1    sensors to respective ones or groups of said subchannels.  Plain

2    language, exactly as we saw in Column 6, you put it into one

3    channel or, if you need, into the groups.

4           So what we're looking at here, regardless of how we

5    slice it, is we're looking at an abstract concept which is coming

6    back full circle.  They admit it could have been done wired and

7    it worked, but it was inconvenient, and now we get to the point

8    where what we've done is we put it wireless.  It wasn't perfect.

9    They tell you how they say they can make it better, but in the

10   end, it really doesn't matter.

11          Critically, when it comes to this abstract concept,

12   it's important to note that there's no new data type.  There's no

13   new data information.  It hasn't -- It's not like they created

14   like a new file format, like a jpeg or they're using a specific

15   protocol.  There's no new data transmission method.  There's no

16   new version of a Bluetooth or a 5G or an LTE.  It doesn't change

17   the amount of data.  It doesn't make the data bigger.  It doesn't

18   make the data smaller, so it's not a compression factor.  All

19   it's doing is manipulating the data in some way and transmitting

20   it.  It doesn't provide a new method of dividing the data.

21   There's nothing in here that says anything is new in that regard.

22          And it doesn't allow the sensor to collect previously

23   unknown information or allow it to collect data more accurately.

24   There's no special processing.  There's no special transmitting.

25   All in all, it's the same inconvenient wired method in its

1    less-than-perfect wireless form.

2         So on this basis, we believe that what we have here in

3    Claim 1 is directed to the abstract idea of dividing the channels

4    into subchannels and then transmitting the data from the sensors

5    through those subchannels.

6         Now in Step Two, as the Court is also, I know, well

7    aware, if we found that there's an abstract concept --

8    Admittedly, if you don't think it's an abstract concept, we don't

9    get to Step Two.  But assuming for the moment that it's pretty

10   abstract, what we're going to have to do is:  We look -- In Step

11   Two, we consider the claims, the elements of the claim

12   individually and in order of combination to determine whether the

13   additional elements transform the nature of the claim into a

14   patent eligible application.  And it can't simply be:  Apply the

15   abstract method to get a result.

16        Now as we've already noted, Claim 1 doesn't require any

17   specific equipment.  There is no multiplexer.  It does require

18   sensors, but the sensors are admittedly all known sensors

19   performing their known functions.

20        If we look, for example, at -- excuse me one moment --

21   Column 5, and we're looking at Line 55, "The data streams are

22   allocated to the 16 subchannels indicated diagrammatically at 64

23   in Figure 2.  The allocation is effected in accordance with the

24   known data rate requirements of the individual sensors according

25   to their known uses."  So the Specification clearly states the

1  sensors aren't doing anything other than what they were known to

2  do in the fashion that they were known to do it.

3          There's no teaching of a different type of

4  multiplexing.  Despite the fact that it says that -- in the brief

5  that there's a multiplexer, which we know that there's not, but

6  as I mentioned before, there actually is no discussion whatsoever

7  in this Specification that says that there is a multiplexer.  To

8  the contrary, if we look at again Column 5, starting at Line 22,

9  we see that the main function of controller 40 is to provide a

10  multiplexing function whereby communication channel 12 is divided

11  into 16 subchannels.  I would respectfully submit that,

12  Your Honor, as you look through this Specification and, in

13  particular, Column 5 where it gets into more details as to what

14  is happening, what we repeatedly see is that everything is

15  completely described in the nature of its functionality.

16          On Line -- For example, starting on Line 29, "The

17  functions of controller are shown as divided into functions 58,

18  60 and 62."  And then going down to Line 37, "which is fed to the

19  RF transmitter function," and this will repeat.  I'm not going to

20  go through it every single time.  But as you go through every

21  single aspect of the physicality of the physical components,

22  they're all described and they're functional.  Transmitters

23  transmit, sensors sense, data processors process, controllers

24  control, et cetera.

25          And if we look at with regard to this processor that's

1    performing this apparently -- allegedly unique multiplexing

2    function, when we look at Column 4, we see that, "As shown in

3    Figure 1, a system 10 for wireless transmission of data through a

4    communication channel 12 between local data sensors 24, 16, 18,

5    20 and 22, and a data-processing function or personal computer

6    24, to receive data therefrom."

7            This is all described in its most generic and

8    conventional fashion; any personal computer and not even a

9    particular processor; a data processing function.  That is not

10   sufficient.  It is purely functional language.  When you review

11   these paragraphs and you review the Spec. as a whole, all we see

12   is there are no new sensors.  There is no new processor.  There's

13   no new controller.  There's no wireless transmitter.  There's no

14   new wired transmitter.  There's no new wireless receiver or

15   otherwise.  Rather, conventional sensors sensing data.

16   Conventional processors processing; in this case, dividing the

17   data; a conventional transmitter transmitting the data.

18           The inventive concept, if there is one, must be

19   apparent in the claim language as this Court knows from its prior

20   decisions in, for example, *iLife* case.

21           THE COURT:  Yeah.  I'd rather you cite the *iLife* case

22   rather than the *Bascom* case, Mr. Labgold.  One for two.

23           MR. LABGOLD:  I understand.

24           THE COURT:  One for two.

25           MR. LABGOLD:  And for what it's worth, *Bascom* threw all

1   the practitioners for a loop as well because it wasn't exactly

2   clear how that slicing was made.  But be that as it may, the

3   Court, like the Lord, sometimes works in mysterious ways,

4   apparently.

5           So -- But, again, as -- as the Court recognized, that

6   it must be clear in the claim language, and there's nothing.

7   There's no new inventive concept that is reflected in this claim

8   language that they could point to, that they can put a pin on,

9   that they can hang their language on.  And for this reason, under

10  all of the standards that are put before us is that we see there

11  are no inventive concepts.

12          I will close, with the exception of any questions you

13  might have, with the issue of futility because in advance of the

14  motion coming in, we suspected that something like this might

15  actually be in the brewing, and that I just submit to the Court

16  that any attempt to do so would be futile on multiple levels

17  because there is, as we've walked through, there is no language

18  in the Specification that says "improve computer functionality."

19  And the Federal Circuit precedents say you can't just say that

20  conclusory.  You need to point to something in the Spec. that you

21  could show actually that computer functionality improvement is

22  reflected.  There's nothing here, and so there's no language that

23  can be added.  There's no factual assertions that can be made and

24  we respectfully submit the addition of claims.

25          And while it's clearly a cribbing problem because of

1    the nature of the way this brief was created, there's a very

2    interesting artifact that I think -- I would like to point out to

3    the Court.  On Page 6, just before the statement of the case, in

4    responding to an issue, which we did not assert, we didn't say

5    that their pleading was insufficient.  Apparently that must have

6    been an issue in the prior *A.B.P.* case, but we didn't complain

7    about their pleadings, but there's a sentence in here that is

8    worth giving a full attribution for, and it's the last sentence

9    of the last full paragraph.  "No further factual pleadings are

10   required."  And we wholeheartedly agree with that.  We do not

11   believe that there are any factual pleadings that are required,

12   nor do we believe that there are any factual pleadings that are

13   possible from this Specification that could save these claims

14   from being found ineligible.

15            And subject to any questions at this point, I have

16   nothing further, Your Honor.

17            THE COURT:  All right.  I have none.

18            Mr. Rabicoff?  Can't hear you, sir.

19            MR. RABICOFF:  Now we have two instances of talking on

20   "mute."

21            Okay.  So first, I'm going to turn to *Alice* Steps One

22   and Two.  And then, you know, because this was brought up in both

23   the Response and the Reply, I do want to circle back briefly to

24   the *A.B.P.* decision and make some comparisons, right, and why

25   this should at least be a good guiding post for the outcome of

31

1   this case.

2          So, first, let's look at *Alice* Step One.  So Claim 1 is

3   not abstract under any reasonable construction of the terms.  And

4   so I think this is one thing that hasn't been addressed yet,

5   right, is the specific problem addressed by Claim 1, and that's

6   facilitating the transmission of data from sensors that have

7   substantially different data transmission requirements.

8          So this isn't about improving the efficiency of a

9   computer; right?  It's about developing a specific wireless

10  protocol that addresses this problem.  So if we look at prior art

11  systems, right, in the prior art you had different transmission

12  rates for data sensors, right, that resulted in the bottlenecks

13  and slowdowns during wireless transmission of data from data

14  sensors to data processors.  So specifically in prior art

15  systems, you had both sensors that -- that could require either

16  high or low data transmission rates, and these systems would set

17  aside the same amount of bandwidth for both types of sensors.

18  And so this means you're using the same amount of bandwidth.

19  You're either overutilizing or underutilizing that amount of

20  bandwidth; right?

21         So Claim 1 provides a discrete method for addressing

22  this problem.  This is the wireless transmission protocol that's

23  been developed on Claim 1.  And what it does is it divides a

24  wireless communication channel into asymmetrical subchannels so

25  that the allocation of data from the data sensors to the

1    subchannels is calibrated to the data-carrying capacities of the

2    subchannels; right?  So, again, this is a -- this is a particular

3    technique.  It's a particular wireless protocol that -- that is

4    carried.  And this is a method; right?  So this is -- We're not

5    claiming an apparatus; right?  It's claiming a particular

6    protocol that addresses this particular problem in the art.  And

7    if you look at the Specification Prosecution History, it makes

8    clear that this is a particular problem that's addressed by Claim

9    1 that can -- that can only arise from transferring data from

10   multiple data sensors within -- within a wireless transmission

11   system.

12        And so this holding, this -- this situation perfectly

13   aligns with the problem that was also solved in *DDR Holdings*, and

14   this is where the Federal Circuit opined that claims are patent

15   eligible when they are, and I quote, "necessarily rooted in

16   computer technology in order to overcome a problem specifically

17   arising in the realm of computer networks."  So, again, this

18   isn't a problem of your processor's too slow.  There's bandwidth

19   bottlenecks.  It's a particular protocol that overcomes -- that

20   uses asynchronous data transmission rates to address a particular

21   issue with bandwidth utilization.

22        So you also look -- Moreover, in Claim 1 it assigns

23   specific functions, right, to particular concrete components to

24   -- to achieve this result.  So, in particular, the claim

25   components are the wireless transmission method itself and what's

1    referred to as the "data processing means."  So it's a wireless

2    transmission protocol that defines a particular data processing

3    means.  And this protocol assigns a novel, discrete functionality

4    to the overall process.  It divides communication channels

5    asymmetrically so the data-carrying capacities of the subchannels

6    are unequal.  It's a limitation, and allows them to be properly

7    calibrated to the bandwidth needs of the sensors which are also

8    claimed and then the data processing needs; right -- this is a

9    specific limitation -- also has a discrete function which is

10   allocating data from local sensors to communication subchannels

11   with data rates being properly calibrated to those sensors.  And

12   an implementation of this is found, for example, in Figures 2 and

13   4 in the Specification which was cited in the brief.

14          Now -- So when we look at OKI's, you know, in the

15   briefing and also just, obviously, in the oral argument, it's

16   finding claim on abstract only by gutting these key limitations

17   from Claim 1.  So OKI sums up Claim 1.  I know there's a dispute

18   over or how they summed it up, but the idea is that we're simply

19   dividing data, right, in a generic manner, in a predictable

20   generic manner using multiple sensors; right?  And, you know, of

21   course, that that's -- maybe that they're going to say that's not

22   an accurate assessment, but the point is that it's merely using

23   generic transmission protocols in order to divide data into

24   multiple subchannels; right?  That's simply not the case here.

25          But in doing so, OKI's read claims at such a high level

1    of abstraction that they become untethered to the claim language.

2    And we know that this has been announced -- This has been

3    prohibited by *Enfish*.  But if we actually look at the field of

4    invention of Claim 1, it's much narrower than OKI's alleged

5    abstract idea.  So the -- the actual field of invention is a

6    wireless transmission of data through communication subchannels

7    with local data sensors and data processing functions to receive

8    that data from the local sensors.  So it's -- And this is all

9    purely tied to the claim language.  That's the actual field of

10   invention.  But from OKI's abstract idea standpoint, it involves

11   really any form of data transmission, right, that divides -- that

12   divides channels in any manner; right?  And it could be a wired

13   or wireless system, even though on this case we're really

14   addressing a unique particular problem in wireless systems,

15   right, by applying this particular wireless protocol; right?

16          So because OKI has elided key limitations, right, the

17   unique functions of the wireless transmission protocol and data

18   processing means, only by doing so, it's able to suggest that

19   Claim 1 is abstract.

20          But, you know, even if -- even if this Court finds that

21   Claim 1 is abstract, which we don't suggest is the case, let's

22   turn to *Alice* Step Two, right, that Claim 1 embodies

23   unconventional and concrete components running discrete

24   operations; right?

25          So Claim 1 recites, and I'll paraphrase the key

1   limitations, that there's a communication channel that is divided

2   by our wireless protocol; that there's the data transmitted

3   through subchannels, and the data processing means allocates data

4   from data sensors through subchannels calibrated for

5   substantially different data requirements; right?  So the

6   wireless transmission protocol and data processing means are

7   discrete components with clearly assigned functions.

8           And, again, this function is not merely speeding up a

9   computer.  It's not applying something to a generic computer.

10  These are particular functions that -- that lead to this wireless

11  transmission protocol that addresses a particular problem in the

12  art.

13          So the Specification simply belies OKI's claim that the

14  data sensors are nothing more than a generic transmission of data

15  that transmits raw data, right, and divides it into subchannels.

16  So as discussed before, prior art systems have assigned the same

17  bandwidth to different sensors regardless of the data bandwidth

18  requirements.  And the claim language in Claim 1 specifically

19  addresses that problem; right?  So if we're taking on this

20  problem in the art, Claim 1 requires this unconventional wireless

21  transmission protocol that's adapted to divide communication

22  channels asymmetrically, in a particular manner asymmetrically,

23  and where the data-carrying capacities of the subchannels are

24  calibrated to the needs of the claim sensors.  So this -- this

25  data processing means works in concert with the claimed wireless

1    transmission protocol, and it carries out a multiplexing

2    functionality; right?  It is a multiplexing functionality to

3    allocate the data and calibrate it in a proper manner to best

4    utilize bandwidth; right?

5           So we look at, you know, what are the two invented

6    concepts; right?  These two invented concepts are, again,

7    directly tied to and, in fact, explained by the claim language.

8    Number one is this process of dividing the communication channels

9    asymmetrically whereby the data-carrying capacities of the

10   subchannels are unequal and calibrated to the data sensory input.

11   And the second is the allocation of data from data sensors to

12   subchannels based on substantially different data rate

13   requirements, and that's fine in the -- found in the data

14   processing means location.

15          So these are -- This is literally just directly tied to

16   the claim language itself where these -- these two inventive

17   concepts arise from.

18          So if we look at -- under *Berkheimer*, I mean this is

19   really important, right, is that OKI keeps stating that, "Well,

20   no, this is not -- there's no sensors, there's no new processer,

21   there's no new method."  And, of course, the standard here is not

22   whether we disagree with that, but the standard is not simply

23   whether "Oh, do you have a new processor or do you have -- do you

24   have something novel;" right?  This conflates novelty with

25   unconventionality; right?  And *Berkheimer* specifically --

1   specifically prohibited that approach.  It said, "The question is

2   whether a particular technology is well understood, routine and

3   conventional."  And that goes beyond simple novelty; right?  This

4   is not simply a test for novelty.

5        So I do want to just kind of briefly, because, again,

6   both the Response brief and the Reply brief address the *A.B.P.*

7   case, so I want -- I just want to point out here how there's

8   similarities; right?  We're talking about a patent where the --

9   it includes a ruling on the same claim, Claim 1; right?  It's the

10  same issue of 101, the same issue of law.  We would argue that

11  this really is substantially identical arguments, not to say that

12  the case law is identical but there hasn't really been, in our

13  view, different cases that were cited, right, that involved

14  actually a very close analogizing between those negative cases

15  and the Claim 1 here.

16       THE COURT:  Well, I would say there are a number of

17  cases that are cited in the Defendant's brief that are more

18  recent than the *A.B.P.* case, none of which you commented on at

19  all, including, but not limited to, *Simio versus FlexSim*

20  *Software*, *Cellspin Soft versus Fitbit*, et al., and *Digitech Image*

21  *Technologies versus Electronics for Imaging*, all of which are

22  discussed at some length in the Defense brief and none of which

23  are discussed in yours.

24       MR. RABICOFF:  Okay, Your Honor.  So let's look at --

25  let's look at a couple of those, the *Simio* being an example.

1   There's one interesting point here, right, which is specifically

2   brought up; right?  The *Simio* case was specifically discussed by

3   opposing counsel in the context of this case coming out after the

4   *A.B.P.* case; right?  What's interesting about that, the actual

5   passage that they cite, and there actually is an inner citation

6   which was omitted, which was omitted in the brief, and that inner

7   citation is a Federal Circuit case from 2015 or it's a Federal

8   Circuit case from 2015, and that was the -- One second.  Let

9   me -- I can pull it up.  I have it in front of me.  Yeah, the

10  *Customedia* case in the Federal Circuit.  It was a 2015.  Now --

11  But let's look at -- let's look at the passage; right?

12          It's the idea that there is claimed improved speed and

13  efficiency inherent with applying the abstract idea on a computer

14  is insufficient to render the claims patent eligible as an

15  improvement of computer functionality; right?  So as has been

16  repeatedly stated, right, this is not about an improvement to

17  computer functionality; right?  It's not about an improvement to

18  speed or efficiency; right?  This has -- specifically has to do

19  with bandwidth bottlenecks that occur as a result of allocating

20  the same amount of bandwidth to -- with respect to data sensors,

21  regardless of the actual bandwidth needs of the sensors

22  themselves; right?  And it's using a particular process of

23  dividing those subchannels; right?  So this is really

24  something -- Is it about a generic computer?  Is it about simply

25  like increasing the processing speed of a computer?  Absolutely

1  not; right?  It's simply not the case; right?  This is -- This is

2  entirely distinguishable from this case.  And the point was, for

3  example, *Simio*, there's really not -- there was not, looking at

4  the claims of *Simio*, really making an analogy between those

5  specific claims in *Simio* and this case.  And that's because, you

6  know, the area is a little bit different; right?  And this is

7  sort of like -- For example, *Digital Imaging Tech* is another

8  example.  It involves a math -- a specific -- well, a

9  mathematical algorithm that's sort of claimed in a very vague way

10  and the idea of using that mathematical algorithm to -- to

11  organize information and allegedly generate new information;

12  right?  It's not tied to a specific structure.

13          It's just not the case here; right?  Here, it's not

14  simply a vaguely referred-to algorithm.  It's a specific

15  protocol.  It has a specific way of dividing channels coming from

16  data sensors, subdividing them in a manner that allows

17  calibration to the data needs of the sensors; right?  It's using

18  a data processing means and a particular wireless protocol to

19  carry this out.

20          So again we find this available.  It's clearly

21  distinguishable from *Digital Imaging Tech* for that reason; right?

22  These are -- There is a specific structure and a concrete

23  assignment of functions to particular components in order -- in

24  order to achieve an unconventional outcome; right?  Also, there

25  is -- there's a really close link between this addressing a very

1    specific problem in the art; right?  It's addressing a specific

2    problem in the art with a discrete solution, and that's simply

3    not the case, you know, these other cases where -- where it

4    really didn't make that -- have that nice close tie between a

5    particular problem in an art and a technical solution that

6    addressed that problem.

7          So for those reasons, we see that these new cases are

8    simply -- are simply unavailing.  And, you know, subject to -- to

9    Your Honor's further questions, for these reasons, we think that

10   the same outcome should be reached as in the *A.B.P.* case.

11         And I should mention, you know, just to be very clear

12   that -- that, in fact, we do believe, you know, looking at, for

13   example, data processing means, right, the idea that there's a

14   wireless transmission protocol, these particular unique

15   limitations, right, do require claim construction; right?  To the

16   extent this wasn't, you know, clear in the brief, it is our view

17   that claim construction is required in light of this, and really

18   it's sort of underlined by the fact that -- that OKI has elided

19   -- elided these key -- on the one hand, elided these key

20   limitations while assessing, right, at the *Alice* Steps One and

21   Two and at the same time suggesting, at least in the brief, that

22   they don't disagree with any of our sort of implicit claim

23   construction position.  I don't think it's possible to hold both

24   beliefs at the same time.  So, in fact, at the very minimum, you

25   know, whatever our implicit constructions are of the claim terms,

 1   there must be a disagreement if there's such a divergence as to

 2   what these claim limitations actually suggest.

 3            So for all those reasons, we suggest that OKI's motion

 4   should be denied.  And I open up to questions at this point.

 5            THE COURT:  No questions.

 6            Mr. Labgold, don't just repeat what you said either

 7   orally or in your briefing.  If you have something specific that

 8   you want to say in response to what Mr. Rabicoff said, this is

 9   the time to do it.

10            MR. LABGOLD:  Thank you, Your Honor.  Just a couple of

11   things quickly.

12            With regard to *Simio* and the curious thing about citing

13   earlier cases, the passage referred to -- cited to was identified

14   as *Customedia*.  *Customedia* is a 2020 case which, I believe, is

15   still after 2018.

16            And then with regard to *A.B.P.*, there still has been no

17   explanation as to what claim construction, in particular, would

18   change the outcome and why their claim construction, as they

19   apply it in their claim chart, is effective.  The primary focus

20   that was discussed was about a specific particular technique and

21   a particular wireless protocol.  Wireless protocol is never

22   discussed in the patent, nor is it discussed anywhere in the

23   claims.  Setting aside the fact that the Specification

24   essentially tells you to try it and if it doesn't work, just do

25   it the old-fashioned way where you divide up the big data amongst

1  a bunch of little ones, the Spec. does not tell you how to

2  perform the allocation.  There is no discussion as to how to do

3  the allocation.  It simply says "allocate."  That's what they say

4  the critical function is but they never tell you how.

5          As in *Affinity Labs*, there is nothing -- quoting from

6  *Affinity Labs* at 1258, "There is nothing in Claim 1 that is

7  directed to how to implement [the concept].  Rather, the claim is

8  drawn to the idea itself, and there is nothing more."

9          With regard to *Berkheimer*, we do not conflate Section

10  102 and 101.  Those are different distinctions.  And I would note

11  that in *Simio*, there's a citation that is worth noting at 1363,

12  quoting, "*Simio* stresses that the executable process limitation

13  is novel but even assuming that is true, it does not avoid the

14  problem of abstractness."  And then quoting from *Synopsys*, the

15  *Simio* court said, "Indeed, a claim for a new abstract idea is

16  still an abstract idea."

17          With regard to the apparent impropriety in our relying

18  upon their claim construction for the purpose of this motion, we

19  would note that that's exactly what was discussed as appropriate

20  in the *Aatrix* case.

21          And other than that, unless there's any questions, I

22  have nothing further, Your Honor.

23          THE COURT:  All right.  What discovery, if any, is

24  required on the settlement agreement issue?

25          Mr. Rabicoff?

1          MR. RABICOFF:  Yes.  So with respect to discovery, you

2     know, I think -- I don't want to sort of limit ourselves; right?

3     I mean we have -- we have the set of e-mails; right?  This has

4     been memorialized.

5          THE COURT:  What else can there be?  You claim a

6     contract --

7          MR. RABICOFF:  Right.

8          THE COURT:  -- is formed by the e-mail communications

9     that you made reference to in your pleading.  What discovery

10    would possibly be germane?  Isn't this a matter of law based on

11    the e-mail communications, either, yes, there is a binding

12    settlement agreement or, no, there's not?

13         MR. RABICOFF:  Your Honor, I believe so.  One issue

14    could be that in the -- in the Defendant's response, something

15    could -- they could make a response that could make other issues

16    relevant; right?  We just don't know how to ---

17         THE COURT:  All right.  Mr. Labgold?  I believe,

18    Mr. Labgold, as I understood your position, it would be, "We

19    agreed on the price, subject to agreement on other terms.  We

20    didn't agree on other terms.  If we accepted some of their other

21    terms, we would pay less" because those additional terms that

22    they wanted would require more of your client.  I'm

23    extrapolating, but that's what I heard you essentially to say.

24    Is that true?

25         MR. LABGOLD:  Yes.  That pretty much accurately sums it

44

1    up.

2          THE COURT:  Okay.  So is this issue of the settlement

3    agreement and whether one was reached a summary judgment based

4    upon the e-mail communications?  Do the e-mail communications

5    tell the complete story, Mr. Labgold?  Or were there oral

6    communications not reflected in the e-mail communications?

7          MR. LABGOLD:  There were oral communications, but for

8    the purpose of this, I mean, again, we're talking about a

9    situation where no contract is actually formed in our view.  We

10   think it's a matter of law.  We're looking at a situation where

11   there's -- We're looking at a pinpoint in time where the only

12   conceptual point that has been agreed is one term on one side,

13   and that is to the extent -- I mean I think that there's enough

14   there as it's pled that that can be decided as a matter of law.

15         THE COURT:  Okay.  Do I have the e-mail communications?

16   Because I don't think I do, but maybe I do and I have missed it.

17   Do I?

18         MR. RABICOFF:  Your Honor, we wanted to be a little bit

19   careful because the settlement would have confidentiality terms.

20   So I want to be a little bit cautious about whether perhaps ---

21         THE COURT:  Okay.  All I want to know is if I have -- I

22   think the answer from your comment is I don't have the e-mails.

23         MR. RABICOFF:  Does not.  That's correct, Your Honor.

24         THE COURT:  All right.  Well, that seems, to me, to be

25   an issue that can be litigated quickly and easily on the papers

1   with whatever sealing order is required.

2          The Court is taking the 101 issue under advisement.

3   For the moment all matters in the case are stayed.  The Court

4   encourages the parties to come up with a protocol to quickly and

5   economically bring to the Court's attention the issues related to

6   the settlement agreement so that that issue can be promptly and

7   economically resolved one way or the other.

8          The Court is taking under advisement *sua sponte* whether

9   any sanctions should be issued in this case based upon the

10  contents of the brief as previously referenced.

11         If there's nothing further, that concludes the hearing.

12  Thank you.

13         MR. TAYLOR:  Your Honor?

14         THE COURT:  Yes.

15         MR. TAYLOR:  This is William Taylor, local counsel for

16  OKI.  I just want to clarify your comment on the stay.  Does that

17  include staying the deadline for answering or moving to dismiss

18  the Amended Complaint?  Or do we need to file a response to that?

19         THE COURT:  You should file such response as you

20  believe is required of you.  If you don't think one is required,

21  then you don't need to file it.  If you do think one is required,

22  then file it.

23         MR. TAYLOR:  Thank you, Your Honor.

24         MR. LABGOLD:  Thank you, Your Honor.

25         THE COURT:  All right.  Thank you.

1              MR. RABICOFF:  Thank you, Your Honor.

2              THE COURT:  That concludes the hearing.  Thank you.

3              (Hearing adjourned at 3:10 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court for

the Northern District of Texas, do hereby certify that pursuant

to Section 753, Title 28, United States Code, that the foregoing

is a true and correct transcript of the stenographically-reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the regulations of

the Judicial Conference of the United States.

        Dated this 16th day of July, 2021.


                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER