# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **MAGNACROSS LLC,** | |
| Plaintiff, | Civil Action No.: 3:20-cv-1959-M |
| v. | **TRIAL BY JURY DEMANDED** |
| **OKI DATA AMERICAS INC.,** | |
| Defendant. | |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT, AND MOTION FOR SANCTIONS AND BRIEF IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................... 5

II.     STATEMENT OF UNDISPUTED FACTS .......................................................... 5

III.    AUTHORITY ....................................................................................................... 13

IV.     ARGUMENT ........................................................................................................ 19

    a.   April 2, 2021 Motion to Dismiss (ECF 26) ................................................. 19

    b.   A valid contract existed between Magnacross, LLC and OKI Data Americas, Inc. ............... 19

    c.   Plaintiff tendered performance or was excused from doing so .................... 24

    d.   Defendant breached the contract ................................................................. 24

    e.   Plaintiff sustained damages as a result of the Defendant's breach ............. 25

    f.   28 U.S.C. § 1927 ........................................................................................ 26

V.      CONCLUSION ..................................................................................................... 28

CERTIFICATE OF SERVICE ................................................................................... 30

CERTIFICATE OF CONFERENCE ......................................................................... 30

## TABLE OF AUTHORITIES

## Cases

*Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984) ................................ 15, 16

*Anderegg v. High Standard, Inc.,* 825 F.2d 77, 80-81 (5th Cir. 1987) ......................................... 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) ................................................. 14, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) .................................................................. 14

*Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994) ............................................................ 16, 22

*Borden v. Banacom Mfg. and Mktg., Inc.,* 698 F. Supp. 121, 123 (N.D. Tex. 1988) ................. 16

*Bowers v. Abundant Home Health, L.L.C.,* 803 F. App'x 765, 767 n.4 (5th Cir. 2020) ............ 16

*Callen v. Pa. R.R. Co.,* 332 U.S. 625, 630 (1948) ......................................................................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986) ....................................................... 14, 15

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ................................................ 15

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) ............................... 14

*Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) ........................................ 16

*E.E.O.C. v. Philip Servs. Corp.,* 635 F.3d 164, 167 (5th Cir. 2011) ............................................ 17

*El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.-Houston [1st Dist.] 2003, pet. denied) ................................................................................................................ 24, 25

*Fulgence v. J Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir. 1981) ................................ 17

*Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.-Houston [1st Dist.] 2014, no pet) ............................................................................................................................... 23

*Guidry v. Halliburton Geophysical Servs., Inc.,* 976 F.2d 938, 940 (5th Cir. 1992) .................. 16

*HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998) ......................................................... 23

*Hencinski v. Austin Com., L.P.*, 2006 WL 325764, at *2 (N.D. Tex. Feb. 13, 2006) ................. 18

*Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) .......................................... 24

*In re Deepwater Horizon*, 786 F.3d 344, 354-55 (5th Cir. 2015) ................................................ 17

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) .................................... 14

*Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.*, 468 S.W.3d 200, 204 (Tex. App.-Houston [14th Dist.] 2015, no pet.) ......................................................................................... 17

*Lawyers Title Ins. Corp. v. Double tree Partners, L.P.*, 739 F.3d 848, 872 (5th Cir. 2014) ..... 18

*Lopez v. Kempthorne*, No. H-07-1534, 2010 WL 4639046, at *4 (S.D. Tex. Nov. 5, 2010) ............. 16, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 597 (1986) ................. 15

*Mid-South Towing Co. v. Har-Win, Inc.,* 733 F.2d 386, 389 (5th Cir. 1984) ....................... 16, 17

*Murray v. Crest Const., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995) ................................................. 24

*Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ..... 24

*Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997) ........................................ 17

*Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 455 (Tex. App.-Dallas 2012, pet. denied) ............................................................................................................................................ 19

*S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ........................................ 16

*Scott v. Harris*, 550 U.S. 372, 380 (2007) .................................................................................... 15

*Smith v. United States,* 328 F.3d 760, 767 n.8 (5th Cir. 2003) (per curiam) .............................. 17

*Stewart v. Courtyard Mgmt. Corp.*, 155 F. App'x 756, 760 (5th Cir. 2005) (per curiam) .......... 18

*Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ................................ 23

*Texas Ear Nose & Throat Consultants, PLLC v. Jones*, 470 S.W.3d 67, 78 (Tex. App.-Houston [14th Dist.] 2015, no pet.) .......................................................................................................... 24

*Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.) .............................................................................................................................. 18

*Western Fidelity v. Bishop*, 2001 WL 34664165, at *22 (N.D. Tex. June 26, 2001) ................................. 18

**Other Authorities**

Black's Law Dictionary, 7th Edition, p.1377 Garner (West Group 1999) ................................................... 20
Law.com Legal Dictionary Definition of settlement,
    https://dictionary.law.com/Default.aspx?selected=1938 (last accessed on August 15, 2021)............... 19
Legal Information Institute Definition of Settlement, https://www.law.cornell.edu/wex/settlement (last
    accessed on August 15, 2021)............................................................................................................. 20
Pocket Size Law Dictionary, p. 306, Gilbert Law Summaries, Harcourt Brace and Company, 1997........ 20

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................................ 14
Fed. R. Civ. P. 56(c) ............................................................................................................................ 15

## I.      INTRODUCTION

Plaintiff Magnacross LLC ("Plaintiff") submits this brief in response in opposition to Defendant's Motion to Dismiss, alternative Motion for Partial Summary Judgment, and Motion for Sanctions and, additionally, Plaintiff respectfully cross-moves the Court to grant Summary Judgment pursuant to Fed. R. Civ. P. 56(a) on Plaintiff's Count II of its Corrected First Amended Complaint, which necessarily provides a full disposition of the matter. Plaintiff's brief in support of its cross-motion for summary judgment is incorporated herein. For its cross-motion for summary judgment, Plaintiff relies on all of the pleadings on file in this case and documents filed in the attached appendix, including all declarations submitted therewith.

## II.     STATEMENT OF UNDISPUTED FACTS

1.      On January 12, 2021, Mr. Labgold, counsel for Defendant, sent Mr. Rabicoff, counsel for Plaintiff an email making an offer to "settle" the case in exchange for Defendant's payment of the sum of $25,000.  Specifically, Mr. Labgold's email stated, "[m]y client is willing to settle the case on a nuisance basis for $25,000.  I look forward to your client's response." A001; A222.

2.      On January 13, 2021, Plaintiff provided a counteroffer to settle the case in exchange for Defendant's payment of the sum of $95,000.  Specifically, the email from Mr. Rabicoff to Mr. Labgold stated, "I'm authorized to counter at 95K, responding to your client's 25K." A002; A222.

3.      The same day, Defendant countered to settle the case in exchange for Defendant's payment of $30,000.  Specifically, the email from Mr. Labgold to Mr. Rabicoff stated, "I am authorized to counter at $30K. Let me know." A003; A222.

4.      On January 15, 2021, Plaintiff counteroffered to settle the case in exchange for Defendant's payment of the sum of $85,000.  Specifically, the email from Mr. Labgold to Mr. Rabicoff stated, "I'm authorized to counter at 85K, to your 30K." A004; A222.

5.      On January 18, 2021, Mr. Labgold sent the following response email to Mr. Rabicoff concerning the offer: "Sorry for the delay in responding.  I am confirming that arriving at the center would do the trick. Please confirm." A005; A222.

6.      On the same day, Mr. Rabicoff replied via email, "Marc: Can you just confirm the number – I understand this is conditional upon my client accepting, but just want to avoid any uncertainty." A005; A222.

7.      On the same day, Mr. Labgold replied confirm the amount to be $57,500 by sending an email in response stating: "57.5." A006; A223.

8.      On this same day, January 18, 2021, Plaintiff accepted the offer to settle the case in exchange for Defendant's payment of the sum of $57,500.  Specifically, Mr. Rabicoff stated to Mr. Labgold in a reply email, "Thanks Marc.  We have an agreement in principle at 57.5" A007; A223.

9.      Almost immediately, Mr. Labgold replied confirming the settlement at $57,500, by stating to Mr. Rabicoff in email, "Thank you. Marc." A008; A223.

10.     On January 20, 2021, Mr. Rabicoff sent Mr. Labgold a draft written settlement agreement. A223; A009-22.  The draft written settlement agreement contains a number of terms in addition to the terms agreed to by the parties on January 18, 2021. *Id.*

11.     On February 8, 2021, Mr. Labgold sent Mr. Rabicoff edits in redline to the draft written settlement agreement. A023-41. These edits did not change the settlement amount. A031; A223.

12.     On February 12, 2021, Mr. Rabicoff sent Mr. Labgold responsive edits in redline to the draft written settlement agreement. A042-57; A224.

13.     For ten days, Mr. Rabicoff did not receive communication from Mr. Labgold regarding this last round of edits to the separate draft written settlement agreement.  Accordingly, Mr. Rabicoff sent an email to Mr. Labgold on February 22, 2021 asking if Mr. Labgold had "any updates?" A058; A224.

14.     On the same day, Mr. Labgold replied, "I am working on narrowing some of the issues and expect to have a revised version by Weds at the latest." A059; A224.

15.     By Thursday, February 25, 2021, Mr. Labgold had not sent edits back as promised, but rather sent the following email: "Are you available for a call to discuss and hopefully resolve the differences between the parties' drafts.  I think a discussion will be much more fruitful than simply exchanging edits. I am available this afternoon after 3pm or any time on Friday." A060; A224.

16.     On Friday. February 26, 2021, Mr. Rabicoff replied by giving Mr. Labgold a link to his online calendar and asking him to choose a time for "Monday/early next week." A061; A224.

17.     Mr. Rabicoff and Mr. Labgold held a call on or about March 2, 2021 to discuss the separate draft written settlement agreement. A224.  On the call, Mr. Labgold raised, among other things, concerning the separate draft written settlement agreement, the concern regarding tax withholding. *Id.* The discussion was concerning whether Plaintiff should be required to provide a tax residency form. *Id.*  Mr. Rabicoff noted that obtaining a tax residency form would take six months or longer, due to the COVID pandemic. *Id.*

18.     On March 9, 2021 Mr. Rabicoff sent Mr. Labgold the following email: "Marc: Do you expect to have edits to our 2/12 draft soon? Just got a hard nudge from my client." A062; A224.

19.     On March 10, 2021, Mr. Labgold sent Mr. Rabicoff the following response email concerning a specific issue as to the requirement of certain documents.

> Issac, I hope all is well.  As a threshold issue, I have confirmed that OKI cannot agree to waive the submission of (a) certificate of U.S. residency, (b) complete Form 3 (Application Form For Income Tax Convention), Form 16 (List of the Members of Foreign Company or List of the Partners of Entity) and Form 17 (Attachment Form For Limitation On Benefits Article) and (c) any other documents required for plural pass-through partners of Magnacross. Please let me know your client's position. A063; A225.

20.     On the same day, Mr. Rabicoff replied,

> Marc: I've facilitated deals with Japanese companies before, and I've learned that a certificate of residency isn't required if you're not seeking any special tax treatment / not seeking a foreign tax credit. My understanding is that you don't need it if you're seeking no benefits under the foreign tax treaty. Let me know whether this is your client's view or not. As I mentioned, it's going to take 1+ year to get the residency certificate. It's simply a non-starter if that's needed before payment. A064; A225.

21.     On the same day, Mr. Labgold replied, "Just to confirm, are you saying that your client accepts that without the documents OKI will be required to withhold 20%?" A065.

22.     On the same day, Mr. Rabicoff replied, "I'm just seeing if this is an option at least – I don't have authorization for it currently." A066; A225.

23.     On March 15, 2021, Mr. Rabicoff sent the following email to Mr. Labgold:

> Marc: Here's where my client is. We brought a lawsuit against the US Oki entity, and also accused those US-based products. So our reasonable belief in agreeing upon a settlement number was that taxes would not be withheld. If it's really not possible to pay through the US entity, our only viable option is to have a payment subject to 20% withholding, because getting a tax certificate isn't viable. My client's opening position is that Oki should gross up this withholding, and bear that cost, since this should have been avoidable. I can probably get them to compromise by having the parties split the cost 50/50. I want to confirm, once more, that avoiding withholding isn't an option. A067; A225.

24.   On the same day, Mr. Labgold replied: " I will discuss with my client and get back asap." A068; A226.

25.   On March 23, 2021 (eight days later), having not received any other communication from Mr. Labgold since his March 15, 2021 email, Mr. Rabicoff sent the following email: "Just following up – any updates?" A069; A226.  Mr. Labgold did not reply to this email.

26.   On March 25, 2021, Mr. Rabicoff sent another email asking for an update: "Marc: Just got a hard nudge from my client, any updates re the tax issue?" A070; A226.

27.   On March 31, 2021, Mr. Labgold finally responds to Mr. Rabicoff via email:

The tax issue is a deal-breaker for my client even before we get to the numerous other problems we only briefly discussed. As such, there is no need to extend the current stay. We will be responding to the complaint. A071; A226.

28.   The next day, on April 1, 2021, Mr. Rabicoff sent the following email to Mr. Labgold: "My client accepts your original proposal, that we bear the 20% withholding tax. I had asked for some time from you so I could discuss this. Please confirm that you've receipted our acceptance of your offer. We're ready to finalize the deal." A072; A226.

29.   The same day, April 1, 2021, Mr. Labgold responded:

As I told you previously, the withholding was only one of the outstanding issues. My previous point was not an offer, it was a question: i.e, whether your client in refusing to provide the requisite tax forms was willing to accept that the tax would be withheld? Regardless, there are numerous other issues that I tried to discuss, only some of which were possible during the 15 minutes you allowed for our discussion. Is your client now willing to accept our mark-up? I do not have authority to accept any offer at this point, I am just asking how you propose moving forward. I in turn will use my best efforts to speak with my client tonight with whatever it is your client is now proposing. I will be available later this afternoon if you want to speak further. If so, please let me know a number and I can call you when I am available. A073; A226-227.

30.   Again on April 1, 2021, Mr. Rabicoff replied:

Marc: Attached are my client's edits, 2/12 draft, that responds to your 2/8 draft. In response, we had a call where you mentioned the tax withholding issue. As discussed, my client initially wanted Oki to share in withholding costs, but is now willing to bear the full 20% withholding costs if we can get this done promptly. That said, we never got feedback from you re our other edits on 2/12. We weren't aware that your client was going to potentially pull out of negotiations, even though I was actively discussing the tax issue with my client, and have ultimately agreed to your client's request on this. I'm available for a call, but ultimately we need some quick feedback on our 2/12 draft. I think we can close this fairly quickly, because I recall the tax issue was the main outstanding issue. A074; A227.

The email once again attached Plaintiff's 2/12/21 redlines on the draft written settlement agreement. A075-89.

31.     On the same day, April 1, 2021 Mr. Rabicoff sent another email: " Marc: Any feedback here? Let's discuss soon -- but my client is unclear where we are with the edits we proposed on 2/12, since we've gotten no feedback." A090; A227.

32.     Additionally on April 1, 2021, Mr. Rabicoff's assistant, Ms. Irina Frye, send Mr. Labgold an email asking for permission to file a request for a 14-day extension. A091; A227.  Mr. Labgold responded via email, "Thank you for your email.  I do not want an extension of time.  I have not asked for an extension of time.  I oppose a further extension of time.  I object to filing the request for an extension of time.  I do not consent to the filing for an extension of time." *Id.*

33.     Again on April 1, 2021, Mr. Rabicoff sent another email: "Marc: Can you please provide your contact information? I called the number on your firms website. I attempted to reach out to you, at your request earlier today, to see if we had agreement on other terms. I didn't hear back from you. Please let me know." A092; A227.

34.     Mr. Labgold responded to this email on April 1, 2021, stating, "I asked for your contact so I could call you when I was available. I am now reachable on 703-xxx-xxxx." A093; A228.

10

35.     Mr. Labgold did not respond to the April 1, 2021 email where Mr. Rabicoff once again sent Plaintiff's 2/12/21 redlines to the draft written settlement agreement.  Mr. Rabicoff sent a follow up on April 5, 2021: "Just following up – any updates?" A094; A228.

36.     On April 7, 2021, after Defendant filed a motion to dismiss this matter, Mr. Rabicoff sent an email and in it, stated, "**2) Settlement. My client agrees to providing all of the required forms under Section 4.2.** See attached -- we reverted our edits to 4.2. We still have other edits -- we're open to negotiating these other terms, but need actual counter-redlines back from you." A095. (emphasis in original)  Attached to this email, Mr. Rabicoff sent Plaintiff's 2/12/21 redlines to the draft written settlement agreement, with the added change that Plaintiff had accepted Defendant's original redlines concerning Section 4.2, the tax withholding section. A096-109; A228.

37.     On April 8, 2021, Mr. Labgold responded to this email, and in pertinent part, stated:

2. I am pleasantly surprised to hear that your client is now willing to provide the required documentation. I am confused however as you repeatedly claimed that the IRS document could not be obtained for at least 12 months. You told me multiple times as recent as last Friday that you had personally confirmed that fact. Has something changed or will we be waiting 12 months for the documents? Please let me know so that I can advise my client accordingly. With respect to edits, I am traveling but will revert with a redlined version upon my return. A110-111; A228.

38.     On the same day, Mr. Rabicoff responded, in pertinent part:

I'm going to focus on point 2 -- my client is simply willing to take the time necessary to get the required docs. I was told this would take ~ 8-9 months. We can still close the deal and dismiss the case before then. To be clear, we cannot get it within a month -- that was never possible. A112; A228-229.

39.     On April 9, 2021, Mr. Rabicoff sent *another* email following up on his April 1 email where Mr. Rabicoff resent his 2/12/21 redlines to the draft written settlement agreement: "Just checking in on this – any updates?" A113; A229.

40.   On April 14, 2021, Mr. Rabicoff sent *another* email asking for feedback on the edits

Plaintiff had sent in April 2021 that accepted Defendant's original edits to Section 4.2 concerning

tax withholding:

> Marc: It's been 1 week since we provided settlement edits that conceded on the necessary documents issue. Do you have any feedback yet? I'm going to get the most flexibility from my client on terms if we close this before we need to answer the MTD (on 4/23). Happy to discuss, thanks. A114; A229.

41.   On the same day, Mr. Labgold finally sent another set of redlines: "Please see the

attached redline." A115-130; A229.  In this redline, for the first time, without any prior discussion,

Defendant changed the settlement amount from $57,500 to $25,000. A121.

42.   On April 15, 2021, Mr. Rabicoff spotted the change in amount and asked Mr.

Labgold about this in an email: "Can you explain the change of settlement amount to 25,000, after

we agreed in principle at 47,500? We presume this is a mistake, since we've continued to negotiate

in good faith and event conceded on the main issue your clients concern, re the necessary

documents." A131; A229.

43.   On the same day, Mr. Labgold responded: "We reached an impasse, after which

my client incurred expense in conjunction with, inter alia, preparing its response to the Complaint.

The current settlement amount reflects such expense. Thus, it is definitely in your clients interest

to reach a final resolution before I need to incur further expense." A132; A229-230.

44.   The next day, April 16, 2021, Mr. Rabicoff responded to Mr. Labgold:

> Marc: We're at a crossroads. 1) The costs of the 101 motion were entirely self-inflicted. We repeatedly offered answer extensions. You well know that you can't win this motion -- this same judge already rejected a 101 motion against the same patent less than 2 years ago based on necessary claim construction. The claims haven't changed since that time, so she'll presumably reach the same conclusion here. 2) I repeatedly requested your counter-redlines or comments so that we could attempt to negotiate terms that concerned your client. When I raised our concerns about the tax documents as an issue, you said multiple times that you were "checking in" with your client. After you said your client wasn't willing to bear any

12

of the taxes, we conceded and said we'd bear the full 20%. 3) Prior to our latest call, at no time did you indicate you were drafting a 101 motion, or that we were somehow at an impasse on terms. You made non sequitur insulations about our edits being much the same as those in a completely unrelated matter -- nothing about how we could make progress on disputed terms. 4) Now, after we made a number of concessions on redlines including the tax forms, you finally provide counter redlines-- which amounted to rejecting ***all*** of our redlines without explanation or comment, and reducing the settlement about
by $20,000. Has your client really ***prohibited*** you from sharing any such feedback, even when it would save the parties significant costs and effort? There's only one path forward for settlement here -- good faith negotiation on terms. Actual ***communication*** over terms your client finds important -- we're not mind readers. If affiliate coverage is a concern -- perhaps we can discuss a combination of reps and covenants that would get us there. But to be completely clear, any modification to the agreed payment amount ***sabotages*** the negotiation and scuttles any conceivable deal. I'm available to discuss early next week. A133-34; A230 (emphasis in original).

45.     On the same day, April 16, 2021, Mr. Labgold sent an email asking if Mr. Rabicoff

intended to include a redline. A135.  Mr. Rabicoff responded the same day and attached a redline.

A136-50; A230.

46.     Mr. Rabicoff immediately followed up that email with another email in April 16,

2021:

> Marc: I was referencing our 4/7 edits (presumably you redlined against that version), which made the concessions I referred to, including the necessary tax documents. As I stated before, if this is a matter of your client being concerned about the scope of CNS/release coverage, we can at least try to work through those details -- I might have wiggle room there if you can give us any feedback on these issues/propose a constructive redline. But we can't countenance a change in the agreed payment amount.  A151; A231.

47.     Mr. Labgold never responded to these emails.  A152; A231

48.     Since settlement was reached on January 18, 2021, Plaintiff was and still is ready,

willing and able to jointly dismiss its claims with prejudice upon receipt of the agreed settlement

amount—$57,500—or $57,500 minus Japanese Tax Withholding amount. A219 (¶ 13).

## III.   AUTHORITY

13

Motions to Dismiss under FRCP 12(b)(6)

A plaintiff fails to state a claim for relief under Rule 12(b)(6) when the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this determination, the court accepts "all well pleaded facts as true, viewing them in the light most favorable to the [non-moving party]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citations omitted). However, the court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (internal citation and quotation marks omitted). To survive a motion to dismiss, [a party's] factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations and footnote omitted).

Motions for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

14

Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. *Id.* at 324; see also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 597 (1986).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 597.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984). They cannot defeat a motion for summary judgment by submitting an affidavit or declaration that contradicts, without explanation, their earlier sworn testimony. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)*; S.W.S.*

15

*Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Albertson*, 749 F.2d at 228. Nor can they rely on conclusory allegations unsupported by concrete and particular facts. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

<u>Breach of Settlement Agreements</u>

A district court "has inherent power to recognize, encourage, and when necessary enforce settlement agreements reached by the parties" in the case before the Court. *Bell v. Schexnayder,* 36 F.3d 447, 449 (5th Cir. 1994); *accord Mid-South Towing Co. v. Har-Win, Inc.,* 733 F.2d 386, 389 (5th Cir. 1984) ("A District Court has the power to enforce summarily a settlement agreement reached in a case pending before it.").

Whereas "the enforceability of a settlement agreement in a diversity case tried in a federal district court in Texas is governed by the provisions of Rule 11, Texas Rules of Civil Procedure ('Texas Rule 11')," *Borden v. Banacom Mfg. and Mktg., Inc.,* 698 F. Supp. 121, 123 (N.D. Tex. 1988) (citing *Anderegg v. High Standard, Inc.,* 825 F.2d 77, 80-81 (5th Cir. 1987)), the validity and enforcement of settlement agreements regarding federal claims is reviewed under federal law, *see Mid-South,* 733 F.2d at 389. Here, because the underlying claims concern alleged violations of federal patent law, the Court must "look to federal law to determine whether the settlement agreement is enforceable or valid." *See Bowers v. Abundant Home Health, L.L.C.,* 803 F. App'x 765, 767 n.4 (5th Cir. 2020); *Mid-South,* 733 F.2d at 389.

Under federal law, settlement agreements are contracts. *See Guidry v. Halliburton Geophysical Servs., Inc.,* 976 F.2d 938, 940 (5th Cir. 1992). A binding settlement "agreement exists where there is a manifestation of mutual assent, usually in the form of an offer and an acceptance." *Lopez v. Kempthorne,* No. H-07-1534, 2010 WL 4639046, at *4 (S.D. Tex. Nov. 5, 2010). "Federal law does not require settlement agreements to be reduced to writing." *E.E.O.C. v.*

16

*Philip Servs. Corp.,* 635 F.3d 164, 167 (5th Cir. 2011). "Absent a factual basis rendering it invalid, an oral agreement to settle a [federal] claim is enforceable against a [party] who knowingly and voluntarily agreed to the terms of the settlement or authorized his attorney to settle the dispute." *Fulgence v. J Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir. 1981).

As with all contracts, agreements to settle federal claims must be entered into voluntarily and knowingly. *See id.* at 1209. "Where a party has knowingly and voluntarily agreed to settle his claims and no change of circumstances warrants repudiation of the agreement, the courts will enforce the settlement agreement." *Bell,* 36 F.3d at 449.

Otherwise, "[t]he federal law of contracts `uses the core principles of the common law of contracts that are in force in most states.'" *Lopez,* 2010 WL 4639046, at *4 (quoting *Smith v. United States,* 328 F.3d 760, 767 n.8 (5th Cir. 2003) (per curiam)). Because "federal contract law is largely indistinguishable from general contract principles under state common law," the Court may rely on federal cases, state contract law cases, and other treatises to the extent it finds them persuasive. *In re Deepwater Horizon,* 786 F.3d 344, 354-55 (5th Cir. 2015) (internal quotation marks and footnotes omitted). "One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity." *Mid-South,* 733 F.2d at 392 (quoting *Callen v. Pa. R.R. Co.,* 332 U.S. 625, 630 (1948)).

Settlement agreements are governed by principles of contract law. *See Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.*, 468 S.W.3d 200, 204 (Tex. App.-Houston [14th Dist.] 2015, no pet.). To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach. *See Valero*

*Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

28 U.S.C. § 1927

Under 28 U.S.C. § 1927, the Court may assess attorneys' fees and costs against an attorney "who has unreasonably multiplied the proceedings in a case." *Stewart v. Courtyard Mgmt. Corp.*, 155 F. App'x 756, 760 (5th Cir. 2005) (per curiam) (citation omitted). Before imposing § 1927 sanctions, the Court must ensure that the attorney "engage[d] in unreasonable and vexatious conduct." *Id.* (quotation marks omitted) (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997)). A finding of unreasonable and vexatious conduct "requires evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court," *id.* (citations and quotation marks omitted), "independent of a showing that the claims pursued were baseless." *Hencinski v. Austin Com., L.P.*, 2006 WL 325764, at *2 (N.D. Tex. Feb. 13, 2006) (citation omitted).

The phrase "unreasonably and vexatiously" is described as: "[C]onduct that, when viewed under an objective standard, is harassing or annoying, or evinces the intentional or reckless pursuit of a claim, defense, or position that is or should be known by a lawyer to be unwarranted in fact or law or is advanced for the primary purpose of obstructing the orderly process of the litigation." *Western Fidelity v. Bishop*, 2001 WL 34664165, at *22 (N.D. Tex. June 26, 2001). The Fifth Circuit has held that "**punishment under § 1927 is sparingly applied**." *Lawyers Title Ins. Corp. v. Double tree Partners, L.P.*, 739 F.3d 848, 872 (5th Cir. 2014) (citations and quotation marks omitted) (emphasis added). This is because sanctions under § 1927 are "punitive in nature and **require clear and convincing evidence that sanctions are justified**." *Id.* (citations and quotation marks omitted) (emphasis added).

## IV.     ARGUMENT

The parties agreed to "settle" the case for $57,500. When it became clear that Defendant was refusing to pay this sum—evidenced in writing—Defendant breached the settlement agreement and continues to breach the settlement agreement.  There is simply no genuine issue of material fact.

### a.   April 2, 2021 Motion to Dismiss (ECF 26)

While Plaintiff agrees that the April 2, 2021 Motion to Dismiss (ECF 26) has been fully briefed and heard, as discussed thoroughly below, that motion is entirely mooted by the January 18, 2021 settlement agreement.

### b.   A valid contract existed between Magnacross, LLC and OKI Data Americas, Inc.

An offer "must be reasonably definite in its terms and must sufficiently cover the essentials of the proposed transaction that, with an expression of assent, there will be a complete and definite agreement on all essential details." *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 455 (Tex. App.-Dallas 2012, pet. denied).

The original offer was made by Defendant, not Plaintiff, through Labgold's January 12, 2021 email when he stated that his client was willing to "settle" the case for $25,000. A001; A222. There is no genuine issue of material fact that Defendant offered to settle—they would agree to a dismissal with prejudice of Plaintiff's claims—in exchange for Defendant paying the sum of $25,000.  Defendant did <u>not</u> condition this on the execution of a written settlement agreement or any other term. It was simply, and explicitly, "settlement" for $25,000.  "Settle" is understood to mean that a case would be dismissed with prejudice. *See* Law.com Legal Dictionary Definition of settlement, https://dictionary.law.com/Default.aspx?selected=1938 (last accessed on August 15, 2021) ("n. the resolution of a lawsuit (or of a legal dispute prior to filing a complaint or petition) without going forward to a final court judgment."); Legal Information Institute Definition of

Settlement, https://www.law.cornell.edu/wex/settlement (last accessed on August 15, 2021) ("An agreement that ends a dispute and results in the voluntary dismissal of any related litigation."); Pocket Size Law Dictionary, p. 306, Gilbert Law Summaries, Harcourt Brace and Company, 1997 ("**settle:** To resolve a dispute; to agree to terms; to reach agreement.") (emphasis in original); Definition of Settlement, Black's Law Dictionary, 7th Edition, p.1377 Garner (West Group 1999) ("An agreement ending a dispute or lawsuit").

Otherwise, "settle" would have no meaning. From Labgold's email, there is no conceivable way to even argue that this was anything other than offer to jointly agree to dismiss the case with prejudice in exchange for $25,000.

Between January 12, 2021 and January 18, 2021, the respective counsel exchanged emails back and forth only negotiating the monetary term. In other words, to be precise, the January 13, 2021 counteroffer from Plaintiff to Defendant was an acceptance of the "settle" term, but counter on the monetary term.  It was an offer to "settle" the case in exchange for Defendant paying $95,000. A001-002; A222.

The same day, Defendant to Plaintiff provided a counteroffer, again only on the monetary term, offering to "settle" the case for $30,000. A003; A222.  On January 15, 2021, Plaintiff again counteroffered, offering to "settle" case for $85,000. A004; A222.

Then on January 18, 2021, Labgold sent an email to Rabicoff explaining that Labgold was checking with Defendant to confirm that the parties could "arri[ve] at the center" to reach agreement on the monetary term. A005; A222. Rabicoff asked Labgold to confirm what that number was, Labgold confirmed it to be $57,500, and then Rabicoff confirm the parties had a deal at $57,500. Labgold confirmed this by stating "Thank you."  In Defendant's Motion, Defendant argues that Plaintiff is selectively quoting Labgold and that Labgold was saying "thank you" in

response to Rabicoff's indication about sending over a separate draft written settlement agreement, not confirming Rabicoff's confirmation that there was an agreement to settle at $57,500. Defendant's Motion at 12. This, however, contradicts the actual emails.  Rabicoff clearly says they have reached an "agreement in principle" at $57,500. A007. Labgold did <u>not</u> respond saying that there was a deal at $57,500 conditioned upon reaching agreement on the separate draft written settlement agreement—in fact Labgold never stated this leading up to the January 18, 2021 settlement agreement—nor did Labgold give any conditions. A001-008. Labgold simply confirmed the agreement at $57,500 through the "Thank you." A008.  The fact that the "Thank you" may also be in reference to Rabicoff's statement that he will send over a separate draft written settlement agreement, does not change the fact that Labgold's "thank you" also confirms a settlement agreement was reached on January 18, 2021, for settlement (dismissal with prejudice) in exchange for Defendant's payment of the sum of $57,500.  If Labgold, as agent for his client, took issue with Rabicoff's declaration that an agreement had been reached, Labgold had an opportunity state it in response on January 18, 2021 (and for several months following this date— before Defendant breached the agreement by changing the number in the separate draft written settlement agreement and refusing to pay $57,500).  He unequivocally did not.

Accordingly, on January 18, 2021, there was an offer and acceptance to "settle" the case (dismiss Plaintiff's claims with prejudice) in exchange for Defendant's payment of $57,500. There is no genuine issue of material fact here.  The terms were explicit, "settle" (which was always a term going back to Labgold's January 12, 2021 email when Labgold first stated it) for Defendant's payment of $57,500.

Defendant's argument is not only incorrect, but it misstates fact.  Defendant argues that $57,500 was but one term of a settlement agreement that contained many terms, thus, if the parties did not reach agreement on other terms, then Defendant is not bound by the monetary term.

This is not what happened. As <u>clearly</u> shown in the emails between Labgold and Rabicoff between January 12 and 18, 2021, the parties reached an agreement to "settle" (dismiss with prejudice) the case in exchange for Defendant's payment of the sum of $57,500. A001-8. This is a settlement agreement that was clearly reached by the parties, and clearly breached by Defendant.

It is true that the parties then went on to attempt to negotiate a separate draft written settlement and license agreement which contained many other terms, but regardless of the negotiation of the separate written settlement and license agreement—**and even if the parties could not reach agreement on a written settlement and license agreement**—that did not change the fact that the parties had reached an agreement on January 18, 2021 to "settle" (dismiss with prejudice) the case in exchange for the sum of $57,500.  As noted above, the Fifth Circuit stated, "[w]here a party has knowingly and voluntarily agreed to settle his claims and no change of circumstances warrants repudiation of the agreement, the courts will enforce the settlement agreement." *Bell,* 36 F.3d at 449.  There are no circumstances that warrant repudiation of the January 18, 2021 settlement agreement, and, thus, the Court should enforce the January 18, 2021 settlement agreement.  Moreover, the negotiations and drafts on the separate draft written settlement agreement unequivocally demonstrate that there was an agreement to settle (dismiss with prejudice, which is tantamount to a license) in exchange for payment of the sum $57,500— until Defendant breached this term by unilaterally changing the settlement amount and refusing to honor the terms of the January 18, 2021 settlement agreement. A132.

22

It is important to keep in mind that it was <u>Defendant</u> who made the initial offer through the January 12, 2021 email, and if Defendant intended the payment to be subject to the execution of a written settlement and license agreement, Defendant could have stated that the offer was subject to mutual agreement on a separate written settlement and license agreement. Defendant did not do so. A001-008. In fact, Defendant could have stated it wanted this condition through every successive counteroffer until agreement was reached at $57,500. It did not do so. A001-008. Courts are not authorized to rewrite agreements to insert provisions parties could have included or to imply terms for which they have not bargained. *Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996). In other words, courts cannot make, or remake, contracts for the parties. *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998).

Defendant's arguments in its motion act as if the parties had conditioned the settlement upon execution of a mutually agreeable written settlement and license agreement, but the undisputed factual record clearly does not show this. A001-008. The record is clear that the only terms of the settlement agreed to on January 18, 2021 were that the parties would "settle" (dismiss with prejudice) in exchange for Defendant's payment of $57,500. A001-008. There is no *genuine* issue of material fact here.

Even if Defendant were correct that *other* terms were to be made later, a binding settlement agreement may exist when parties agree upon some terms, understanding them to be an agreement, and leave other terms to be made later. *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.-Houston [1st Dist.] 2014, no pet). The parties here clearly understood that there was an agreement, in writing, to settle (dismiss with prejudice) the case in exchange for Defendant's payment of the sum of $57,500 to Plaintiff. This material fact is not changed even if there were other terms to be made later, that were never agreed to.

23

### c.   Plaintiff tendered performance or was excused from doing so

Only a party's material breach will excuse the other contracting party's performance. *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *see also Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

Since settlement was reached on January 18, 2021, Plaintiff was and still is ready, willing and able to jointly dismiss its claims with prejudice upon receipt of the agreed settlement amount—$57,500—or $57,500 minus Japanese Tax Withholding amount. A219 (¶ 13).  As discussed below, because Defendant materially breached the contract—by failing to pay $57,500 to Plaintiff—Plaintiff is excusing from performing (dismissing its claims with prejudice) on the contract. Having said that, Plaintiff reiterates it is ready, willing and able to dismiss its claims in this case with prejudice upon receipt of $57,500 from Plaintiff—with or without any Japanese Tax withholding. *Id.*

### d.   Defendant breached the contract

If an agreement of settlement is breached by one of the parties, the other party may treat the agreement as repudiated and claim rights either under the agreement or the underlying cause of action. *Murray v. Crest Const., Inc.*, 900 S.W.2d 342, 344 (Tex. 1995). To constitute a repudiation, a party to a contract must have absolutely and unconditionally refused to perform the contract without just excuse. *Texas Ear Nose & Throat Consultants, PLLC v. Jones*, 470 S.W.3d 67, 78 (Tex. App.-Houston [14th Dist.] 2015, no pet.) (citing *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 621 (Tex. App.-Houston [1st Dist.] 2003, pet. denied)). The

refusal to perform must be unconditional and the renunciation of the contract must be complete. *El Paso Prod. Co.*, 112 S.W.3d at 621.

On April 14, 2021, when Defendant unilaterally changed the monetary term of the separate draft written settlement and license agreement to $25,000, this was the first time Defendant gave notice that it had no intent to satisfy the $57,500 payment term of the January 18, 2021.  This was confirmed by Labgold's April 15, 2021 email claiming that Defendant incurred expense due to an impasse (on the separate draft written settlement and license agreement) that was allegedly reached and that the "current settlement amount reflects such expense." A132. Despite Rabicoff protesting this change, Labgold and Defendant refused to change back the amount.  As it stands, Defendant has made it clear that it will not pay Plaintiff $57,500 (with or without Japanese tax withholding) in exchange to "settle" (dismiss with prejudice) this case. *Id.*  This means that Defendant has materially breached the January 18, 2021 settlement agreement and there is no genuine issue of material fact as to Defendant's breach.  Again, Defendant argues there is no breach because Defendant argues there is no settlement, but as discussed above, the record clearly shows there was a settlement agreement reached on January 18, 2021 to "settle" (dismiss with prejudice) in exchange for Defendant's payment of the sum of $57,500. There is no genuine issue of material fact—Defendant breached the January 18, 2021 settlement agreement by not paying, and refusing to pay, the sum of $57,500 to Plaintiff in exchange for a dismissal with prejudice.

### e.  Plaintiff sustained damages as a result of the Defendant's breach

Plaintiff has been clearly damaged as it agreed to settle this case for $57,500 on January 18, 2021 and yet has still had to continue to litigate this case to the present, including briefing and arguing the motion to dismiss filed on April 2, 2021 (ECF 26), which is and was mooted by the January 18, 2021 settlement agreement, but for Defendant's breach. Moreover, during the

negotiation of the separate draft settlement agreement, Plaintiff offered to file an extension to the answer deadline and/or motion to stay the case, so the parties could avoid further costs during the negotiation.  A091.  Defendant refused and instead filed its § 101 motion to dismiss on April 2, 2021, thereby increasing the damages to Plaintiff because Plaintiff had to brief and argue a motion that was mooted by a settlement reached nearly three months prior. There is no genuine issue of material fact that Plaintiff has been damaged by Defendant's breach of the settlement agreement.

### f.   28 U.S.C. § 1927

Given it is clear that Defendant breached the January 18, 2021 settlement agreement, it is nonsensical that Defendant would bring a motion for sanctions under § 1927 against Plaintiff's counsel for Plaintiff's raising the breach of the settlement agreement as a cause of action.  There is no bad faith, improper motive, or reckless disregard of any duty owed to the Court.  Plaintiff was and is entitled to raise this action based on Defendant's breach of the January 18, 2021 settlement agreement, and only did so when it became clear to Plaintiff and their counsel that Defendant would not cure the breach.

Defendant argues that this claim was raised the day before the hearing on the April 2, 2021 motion to dismiss as a means of leverage, but this misstates the facts.  In May 2021, Plaintiff engaged local counsel, Mr. Chaudhari, to assist with the litigation. A219 (¶ 17). Chaudhari, only having been informed that there were stalled settlement talks and not initially apprised of Defendant's breach of the January 18, 2021 settlement agreement, offered to engage in settlement discussions directly with Labgold to help settle the case. A232-233. Chaudhari sent an email on May 26, 2021, asking to have a zoom call to "share screen" the separate draft settlement agreement. A153; A233. **Weeks** later, Labgold only agreed to having Chaudhari mark up OKI's edits and then "go from there" and delayed having this call for nearly two months—until after the July 14, 2021

26

hearing on the April 2 motion to dismiss—likely in an attempt to gain leverage in getting Plaintiff to waive its claim for breach of the January 18, 2021 settlement agreement and agree to the reduced $25,000 amount.   A234-235; A157 ("Go from there" email sent by Labgold on June 4, 2021); A189 (June 22, 2021 email from Labgold confirming he would review Chaudhari comments and "confirm times for a call asap"); A190 (June 29, 2021 Chaudhari email to Labgold following up since Chaudhari had received any communication from Labgold since June 22, 2021); A191 (June 30, 2021 email from Labgold stating that the edits to section 4.2 were a "non-starter" and that "its not worth either of us wasting our time."); A193 (July 2, 2021 Chaudhari email stating that Plaintiff was agreeable to the tax form requirements and asking for a zoom call on July 6, 2021); A209 (July 5, 2021 email from Ms. Waiter stating that Labgold is only available for a zoom call on July 16, 19, 20).   Once the complaint was amended to add this claim, Labgold refused to discuss settlement with Plaintiff and this zoom call with share screen to go over the draft written settlement agreement never occurred. A213 (July 16, 2021 email from Labgold stating that the time on the call set for July 20, 2021 should be used for something other than the zoom call screen share that Chaudhari has been requesting since May 26. 2021); A214 (July 16, 2021 email from Chaudhari asking Labgold to confirm that he did not wish to discuss the separate draft written settlement agreement and if so, the call should be cancelled); A215 (July 19, 2021 email from Labgold confirming cancellation of the July 20, 2021 zoom call).

In other words, Labgold intentionally stalled efforts by Chaudhari to resolve the matter. Id.; A236 (¶¶ 22-23).  Despite the fact that the parties reached agreement on settlement on January 18, 2021, Defendant breached this agreement and then had its counsel, Labgold, intentionally stall settlement talks with Chaudhari. Incredulously, it is Defendant arguing that Plaintiff's attorneys should be liable for sanctions under § 1927 when the only evidence of "bad faith, improper motive,

or reckless disregard of the duty owed to the court" relates to Labgold's involvement in helping Defendant willfully breach the January 18, 2021 agreement, filing a § 101 motion to dismiss on a case that settled months prior and delaying discussions with Chaudhari for months, until after the Court heard Defendant's April 2, 2021 motion to dismiss, which is mooted by the January 18, 2021 settlement agreement.  While Plaintiff does not go so far as to bring a motion against Labgold for sanctions under § 1927 at this time for this conduct and the frivolous raising of this § 1927 motion, Plaintiff reserves the right to do so at a later time.  In any event, Defendant has failed to meet its clear and convincing burden that § 1927 sanctions are justified, and cannot meet this high burden to justify a punishment the Fifth Circuit has held should be "sparingly applied," because *Defendant* clearly breached the January 18, 2021 settlement which is the subject matter of the new claim, and, thus, the Court should, respectfully, summarily deny Defendant's motion for § 1927 sanctions against Plaintiff's attorneys.

## V.    CONCLUSION

There is no genuine issue of material fact that the parties entered into a settlement agreement as evidenced by emails between counsel on January 12 and 18, 2021.  That settlement agreement was to "settle" (dismiss with prejudice) in exchange for Defendant's payment of $57,500. Despite Defendant's pleas that this was just one term of the much longer written settlement and license agreement that did not bind Defendant absent mutual agreement on the written agreement, the offer to "settle" was never conditioned by Defendant on reaching a full written agreement, but was always simply an offer to "settle" to for a certain monetary sum, which was agreed to be $57,500. Defendant has clearly breached this agreement by refusing to pay $57,500 (with or without Japanese tax withholding), and there is no genuine issue of material fact concerning this.  Accordingly, not only should the Court respectfully deny Defendant's motion to

dismiss, or in the alternative, motion for summary judgment and motion for sanctions, the Court should respectfully grant Plaintiff's cross-motion for summary judgment for breach of the January 18, 2021 settlement agreement and award Plaintiff $57,500.00 as damages for the beach, and respectfully enter final judgment against Defendant, ending this litigation.

Dated:  August 19, 2021                              Respectfully submitted,

_/s/ Isaac Rabicoff_____
Isaac Rabicoff
**Rabicoff Law LLC**
73 W Monroe St
Chicago, IL 60603
(773) 669-4590
isaac@rabilaw.com

Papool S. Chaudhari
State Bar No. 24076978
PRA Law
2800 Bartons Bluff Lane #1902
Austin, TX 78746
Tel. (214) 702-1150
papool@pralawllc.com

**Counsel for Plaintiff**
**Magnacross LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on all counsel of record who have appeared in this case on August 19, 2021, and who are deemed to have consented to electronic service via the Court's CM/ECF system pursuant to Local Rule CV-5.1(d).

*/s/ Isaac Rabicoff*
Isaac Rabicoff

## CERTIFICATE OF CONFERENCE

No conference is required for Plaintiff's cross-motion for summary judgment as summary judgment motions are excluded from this requirement.

*/s/ Isaac Rabicoff*
Isaac Rabicoff